UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

UNITED STATES OF AMERICA,                    Court File No. 17-cr-232 (SRN/LIB)

       Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Robert John Ferriera,

       Defendant.

---

This matter comes before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. § 636 and Local Rule 72.1, upon Defendant Robert John Ferriera's ("Defendant") Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 23], and upon Defendant's Motion to Suppress Statements, Admissions, and Answers. [Docket No. 24]. The Court held a motions hearing on November 7, 2017, regarding the parties' pretrial motions.[1] At the motions hearing, the parties requested the opportunity to submit supplemental briefing, which was completed on December 20, 2017, and after which Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 23], as well as, his Motion to Suppress Statements, Admissions, and Answers, [Docket No. 24], were taken under advisement.

For reasons discussed herein, the Court recommends that Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 23], be **DENIED**, and that Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 24], be **DENIED**.

---

[1]The Court addressed the parties' pretrial motions for discovery and production of evidence by separate Order. [Docket No. 30].

# I.    BACKGROUND AND STATEMENT OF FACTS

## A.  Background

Defendant is charged with one count of possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5861(d) and 5871; one count of felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and one count of felon in possession of ammunition, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Indictment [Docket No. 1]).

## B.  Facts

The record presently before the Court indicates that on July 3, 2017, Sergeant Brandon Pearson ("Sgt. Pearson") of the Wadena Police Department was called to the police station to speak with a complainant who had come to the police department to lodge a complaint. (November 7, 2017, Motions Hearing, Digital Recording at 10:58–11:00 a.m.). Sgt. Pearson returned to the police department to meet with the complainant. (Id.). Upon meeting with the complainant, Sgt. Pearson was able to obtain her name and phone number, as well as, other contact information. (Id. at 11:00–11:01 a.m.). The complainant also provided a recorded statement. (Id.).

The complainant informed Sgt. Pearson that she had gone to Defendant's apartment to retrieve a bicycle and some money from Defendant on behalf of a third party. (Id.). She stated that she was familiar with Defendant so she knocked on the door, and Defendant invited her into the apartment; however, when she inquired about the items she sought to retrieve the Defendant became agitated. (Id. at 11:01–11:02 a.m.). She further stated that after Defendant became agitated he went to the west side of the apartment and in one fluid motion grabbed a "short shotgun,"[2] removed it from its holster, broke it open at the action, loaded a shell from his pocket

___

[2] Sgt. Pearson asked complainant how she knew it was a shotgun, and she responded that she was familiar with shotguns.

into the shotgun, and closed the shotgun. (Id.). The complainant told Sgt. Pearson that Defendant was waiving the gun around, that Defendant told her he wanted her to know he had the shotgun, and that he used it when he felt he or his family were being threatened. (Id. at 11:01–11:03 a.m.). This frightened the complainant who began to cry which prompted Defendant to ask if he was scaring her. (Id. at 11:02–11:03 a.m.). When she responded that she was scared, Defendant apologized, unloaded the shotgun, and put it away. (Id.). The complainant then left the apartment, and she drove directly to the police department, which was a block away, where she reported the incident to Sgt. Pearson within minutes of the incident occurring. (Id.).

Sgt. Pearson notified other officers of the complaint, and he informed those officers that he was going to contact Defendant to speak with him about the incident.[3] (Id. at 11:05–11:06 a.m.). Sgt. Pearson testified that, after hearing complainant's description of the incident, he believed Defendant could be in unlawful possession of a short barreled shotgun and could have been involved in a second degree assault involving a firearm. (Id. at 11:03–11:05 a.m.). Upon calling Defendant, Sgt. Pearson reminded him who he was and asked if Defendant would speak with him. (Id. at 11:04–11:06 a.m.). Defendant agreed to speak with Sgt. Pearson. (Id.).

Sgt. Pearson and Officer Nate Warner ("Officer Warner") responded to Defendant's apartment.[4] Sgt. Pearson parked in the front of the apartment, and Officer Warner parked on the public street adjacent to the apartment at a location approximately fifty feet from Sgt. Pearson's vehicle and where his vehicle could not be seen from the front door of the apartment. (Id. at

---

[3] Sgt. Pearson already had Defendant's phone number as Sgt. Pearson was familiar with Defendant due to an unrelated, previous complaint involving Defendant's aggressive dog at a gas station. (Id. at 11:03–11:04 a.m.).

[4] Sgt. Pearson had called Defendant using his cell phone before Sgt. Pearson left the police department; however, due to the short distance between Defendant's apartment and the police station, Sgt. Pearson and Defendant were still talking on the phone when Sgt. Pearson arrived at Defendant's building and Defendant came outside. (Id. at 11:27–11:28 a.m., 11:48–11:50 a.m.).

11:07–11:09 a.m.).[5] Defendant exited his apartment and approached Sgt. Pearson's vehicle where he and Sgt. Pearson had a conversation next to Sgt. Pearson's vehicle. (Id. at 11:09–11:11 a.m.).

Sgt. Pearson and Defendant had an initial conversation in front Sgt. Pearson's patrol vehicle in which Sgt. Pearson informed Defendant of the complaint which Sgt. Pearson had received, and he asked if Defendant would consent to a search of his apartment. (Id. at 11:10–11:12 a.m., 11:50–51). Sgt. Pearson described the conversation as casual. (Id.). Defendant denied having a short barrel shotgun, and he denied Sgt. Pearson's request to search the apartment without a warrant. (Id.).

After this initial conversation, Sgt. Pearson and Officer Warner's testimony differ from the testimony of Defendant regarding what next took place.

According to the testimony of Sgt. Pearson and Officer Warner, Sgt. Pearson asked Defendant to accompany the officers to Officer Warner's vehicle, and Defendant walked with them to the vehicle voluntarily and without reservation. (Id. at 11:13–11:14 a.m., 11:44–11:45 a.m., 12:01–12:02 p.m.). Upon arriving at Officer Warner's vehicle, Sgt. Pearson asked Defendant to have a seat in the back of the squad vehicle, but Sgt. Pearson told Defendant that he would first have to pat down search Defendant. (Id. at 11:13–11:14 a.m., 11:32–11:33 a.m.). Sgt. Pearson pat down searched the front of Defendant's pants pocket by patting the outside of Defendant's clothes, and he felt a hard cylindrical object which Sgt. Pearson removed from Defendant's pocket due to his concern that it may have been a weapon. (Id. at 11:14–11:15 a.m.). The object was a yellow 20-guage shotgun shell. (Id.). Upon discovery of the shell, Sgt. Pearson told Defendant to have a seat in the back of the squad vehicle while the officers obtained a search

---

[5] Other officers were spread out in the general area; however, they were not visible as they were not within the adjacent blocks. (Id. at 11:05–11:06 a m., 11:28–11:29 a.m.).

warrant for Defendant's apartment. (Id. at 11:15–11:16 a.m., 12:01–12:02 p.m.). Defendant, however, responded by saying "that was not necessary" because he would show the officers were the shotgun was located in the apartment. (Id. at 11:15–11:16 a.m., 12:02–12:03 p.m.). Defendant also stated he initially lied about having a shotgun which he used for protection, explained that he took the shotgun from a gang member in California, and said that he knew he was not supposed to possess firearms. (Id. at 11:15–11:16 a.m.). Sgt. Pearson and Officer Warner both testified that neither of them asked Defendant any questions to prompt his statement that a warrant was unnecessary nor to prompt his statement as to how he acquired the shotgun. (Id. at 11:46–11:47 a.m., 12:03–12:04 p.m.). Defendant then led the officers into the apartment due to concerns with Defendant's dog which had previously been reported as aggressive. (Id. at 11:16–11:17 a.m.).

According to the testimony of Sgt. Pearson and Officer Warner, upon entering the apartment, Defendant stood in the kitchen and directed Sgt. Pearson to the bedroom where the shotgun could be found under the bed linens. (Id. at 11:17–11:19 a.m., 11:38–11:39 a.m., 12:04–12:05 p.m.). Sgt. Pearson recovered the shotgun, and he handed it to Officer Warner. (Id.). Sgt. Pearson then asked Defendant if there was any ammunition in the apartment. (Id. at 11:19–11:20 a.m., 12:04–12:05 p.m.). Defendant did not verbally respond, however, he walked over to the west side of the apartment, grabbed a black cloth bag, handed the bag to Sgt. Pearson; and the bag contained additional yellow shotgun shells similar to the one previously discovered in Defendant's pocket. (Id.).

Sgt. Pearson then told Defendant that he was going to have to come with officers to the Wadena County Jail, but they allowed Defendant to first secure his apartment. Defendant and the officers then left the apartment which Defendant had secured, and the three of them walked to

5

another deputy who had arrived on the scene. (<u>Id.</u> at 11:21–11:22 a.m., 12:05–12:07 p.m.). Defendant was then informed he was being placed under arrest, and he was only then placed in handcuffs. (<u>Id.</u> at 11:21–11:23 a.m., 12:06–12:07 p.m.). Sgt. Pearson and Officer Warner both testified that this was the first time Defendant was placed in handcuffs—specifically testifying that Defendant had not been placed in handcuffs during any other time during the encounter. Officer Warner and Sgt. Pearson also testified that the officers never raised their voices, issued any threats, nor drew their service weapons, and that Defendant was polite and cooperative during the entire encounter. (<u>Id.</u> at 11:09–11:14 a.m., 11:22–11:23 a.m., 12:01–12:04 p.m., 12:06–12:07 p.m.).

Defendant's testimony presents a different series of events. According to Defendant, after he initially declined Sgt. Pearson's request to search the apartment, he was handcuffed and escorted to Officer Warner's vehicle where Defendant was pat down searched. (<u>Id.</u> at 11:51–11:52 a.m.). During that pat down search Sgt. Pearson discovered the shotgun shell, and Defendant was placed in the back of Officer Warner's vehicle. (<u>Id.</u>). The officers then informed Defendant that they were going to get a search warrant. (<u>Id.</u>). According to Defendant, Sgt. Pearson returned approximately five to ten minutes later, waived a piece of paper in Defendant's face, said "got it," and "mumbled something" about Defendant's dog. (<u>Id.</u> at 11:52–11:53 a.m.). Defendant testified that he believed that the officers were going to shoot his dog, so he asked to be given the opportunity to hold the dog. (<u>Id.</u>). For that reason, Defendant accompanied the officers into the apartment. (<u>Id.</u>). Once inside the apartment, Defendant testified he was placed on the couch. (<u>Id.</u> at 11:53–11:55 a.m.). Defendant testified that he was handcuffed the entire time, he thought the officers had obtained a search warrant, and he never consented to a search. (<u>Id.</u> at 11:53–11:57 a.m.).

Both Sgt. Pearson and Officer Warner testified that they never indicated to Defendant they had a search warrant, and neither of them waived any papers in front of Defendant. (Id. at 12:03–12:04 p.m., 12:13–12:14 p.m.).

## II.    DEFENDANT'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF SEARCH AND SEIZURE. [DOCKET NO. 23].

Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 23], seeks an Order of this Court suppressing any physical evidence obtained as a result of the search of Defendant's person and residence. Defendant argues that the "physical evidence should be suppressed because the warrantless 'consent' search of the apartment was the product of an initial illegal seizure of [Defendant], an illegal pat down search, the illegal seizure of a shotgun shell from his pocket, and the fruit (the gun and shotgun shells) must be suppressed." (Def.'s Mem., [Docket No. 34], at 1).

The Government argues that the police had ample reasonable articulable suspicion to conduct the initial pat down search of Defendant, and Defendant knowingly and voluntarily consented to the search of his residence. (Gov't's Mem., [Docket No. 39], at 2).

Although not addressed specifically by either party, the Court must first address the conflicting testimony in the present case.

### A.  Testimony

As previously noted, Defendant testified that he was handcuffed as soon as he refused to allow Sgt. Pearson to search the apartment and that he remained handcuffed throughout the remainder of the encounter, that he was shown a piece of paper and told it was a search warrant, and that he only went with the officers into the apartment with the officers to protect his dog. However, Officer Warner and Sgt. Pearson both independently testified that Defendant was not placed into handcuffs until after the discovery of the evidence in the present case, and even then,

only after Defendant was allowed to secure his apartment. The Officers also both independently testified that neither of them ever waived any piece of paper in Defendant's face or insinuated they had in fact obtained a search warrant.

Having considered all of the evidence and testimony in the present case, the Court finds that Defendant's version of events on the record now before the Court is not credible. The Court finds the testimony of Officer Warner's and Sgt. Pearson to be credible. Officer Warner's and Sgt. Pearson's demeanor and statements were straightforward and concise without the appearance of being defensive or evasive. Their testimony was clear from the facts they each separately and independently recalled. Defendant's testimony, on the other hand, was less than straightforward and, at times, nonresponsive and narrative. Officer Warner and Sgt. Pearson testified independently out of the presence of the other and each of their testimony corroborated independently the testimony of the other.

The Court finds it unlikely that Defendant would not have asked for a copy of the search warrant or at least asked to inspect the document if he had been so adamantly declining to allow law enforcement to search his apartment especially in light of Defendant's previous and extensive history of experience dealing with law enforcement. Moreover, portions of Defendant's own testimony actually corroborates the testimony of Officer Warner and Sgt. Pearson. For instance, Defendant testified that the interaction between himself and Sgt. Pearson began just as Sgt. Pearson testified it began, and Defendant agreed that they began talking by having a conversation in front of Sgt. Pearson's patrol vehicle. Furthermore, both Officer Warner and Sgt. Pearson are experienced law enforcement officers while Defendant has a great deal of self-interest in having the evidence at issue suppressed; which taken together tends to further support the finding of Officer Warner's and Sgt. Pearson's testimony more credible. See, United

8

States v. Gleason, 25 F.3d 605, 607 (8th Cir. 1994) (finding that a law enforcement officer's testimony may be given more weight than that of a defendant who has a "great deal of self-interest in having the testimony suppressed"). Accordingly, the Court finds Officer Warner's and Sgt. Pearson's testimony the more credible.

### B.  Standard of Review

The Fourth Amendment guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. Amend. IV.

### C.  Analysis

Defendant argues that the shotgun and shotgun shells seized in the present case should be suppressed because he was the subject of an "illegal pat down search," he never voluntarily consented to a search of his residence, and his initial seizure was "illegal." Therefore, Defendant argues the fruit of this illegal conduct must be suppressed. (Def.'s Mem., [Docket No. 34], at 1). To the extent the Court should find Defendant did express words of consent regarding a search of his apartment, Defendant argues the alleged consent was "the illegal product/fruit of the illegal pat down search and seizure of the shotgun shell, [and] therefore the fruits of the subsequent search of the apartment must be suppressed." (Id. at 8). Defendant also argues that the Government has failed to "meet its burden of proving a valid and voluntary consent for the search in this case." (Id. at 9).

As discussed above, the Court finds the testimony of Officer Warner and Sgt. Pearson to be the more credible. Accordingly, the Court considers Defendant's motions in light of that testimony.

After consideration of Defendant's arguments, as well as, all of the evidence and testimony now before the Court, the Court finds that Defendant was not initially seized nor his person subject to a pat down search in violation of his constitutional rights, and Defendant gave informed, voluntary consent to search his residence.

### 1. Initial Contact

Defendant's first contact with law enforcement was the cell phone call between Defendant and Sgt. Pearson during which Defendant agreed to meet and speak with Sgt. Pearson. Defendant and Sgt. Pearson then had a casual conversation while standing in front of Sgt. Pearson's patrol vehicle. Neither that initial phone call nor the initial conversation in front of the patrol vehicle amount to a seizure of Defendant. "[A] seizure does not occur simply because a police officer approaches an individual and asks a few questions." Florida v. Bostick, 501 U.S. 429, 434 (1991). "So long as a reasonable person would feel free 'to disregard the police and go about his business,' the encounter is consensual and no reasonable suspicion is required." Id. (internal citation omitted).

In the present case, Sgt. Pearson asked Defendant if Defendant would be willing to talk with him, and Defendant agreed. During the initial conversation, the two stood in front of Sgt. Pearson's patrol vehicle. Nothing in the record indicates that law enforcement blocked Defendant's movement in any way, threatened or touched Defendant in any way during this initial conversation, nor displayed any weapons. During the cell phone conversation and the initial conversation in front of Sgt. Pearson's patrol vehicle, the encounter with Defendant was consensual. See, United States v. Hayden, 759 F.3d 842, 847 (8th Cir. 2014) ("Merely identifying oneself as "Police" does not effect a seizure of a citizen who stops to listen or talk,

because self-identification is not a command on the nature of 'Police, Halt!' or 'Stop, in the name of the law.'").

### 2. Pat Down Search

Defendant next argues that even if he wasn't seized when he initially began speaking with law enforcement, he was seized was he was subject to a pat down search and asked to wait in the back of Officer Warner's patrol vehicle. Assuming for argument that Defendant may have been seized when he went with Sgt. Pearson and Officer Warner to wait in Officer Warner's patrol car, and where Defendant was the subject of a pat down search, that temporary seizure and pat down search were justified under the Fourth Amendment by reasonable suspicion that criminal activity was afoot and concerns for officer safety.

"Law enforcement officers may make an investigatory stop if they have a reasonable and articulable suspicion of criminal activity." United States v. Hightower, 716 F.3d 1117, 1119 (8th Cir. 2013) (quoting United States v. Bustos-Torres, 396 F.3d 935, 942 (8th Cir. 2005)). This type of investigatory stop is commonly referred to as a Terry stop. See, Id. (citing Terry v. Ohio, 392 U.S. 1 (1968)).

A Terry stop is justified when there is reasonable suspicion that the individual being stopped is currently engaged in criminal activity or previously committed a crime. United States v. Hughes, 517 F.3d 1013, 1016 (8th Cir. 2008). "A reasonable suspicion is a 'particularized and objective' basis for suspecting [criminal activity by] the person who is stopped." Hightower, 716 F.3d at 1119–120 (alteration in original). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." United States v. Sokolow, 490 U.S. 1, 7 (1989) (internal quotations marks omitted). "Although a mere hunch does not create reasonable suspicion, the level of suspicion the standard requires is considerably less than proof of

wrongdoing by a preponderance of the evidence and obviously less than is necessary for probable cause." Navarette v. California, 134 S. Ct. 1683, 1687 (2014).

The inquiry into whether reasonable suspicion exists considers whether "the facts available to the officer at the moment of the seizure . . . warrant a man of reasonable caution in the belief that the action taken was appropriate." Terry, 392 U.S. at 21–22. It is an objective standard based on the information known to the officers at the time of the seizure. United States v. Hamilton, 591 F.3d 1017, 1022 (8th Cir. 2010). A reviewing court utilizes a totality of the circumstances analysis to determine whether reasonable suspicion exists. Hughes, 517 F.3d at 1016.

Furthermore, "[a] police officer who has a legitimate contact with another person, and who has reason to believe that person may be armed and dangerous, may conduct a pat-down search to protect officer safety, regardless of whether there is also probable cause to arrest." United States v. Menard, 95 F.3d 9, 10–11 (8th Cir. 1996) (citing Terry, 392 U.S. at 27). "[T]he 'officer need not be absolutely certain that the individual is armed; the issue is whether a reasonable prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" United States v. Roggeman, 279 F.3d 573, 578 (8th Cir. 2008) (quoting Terry, 392 U.S. at 27).

In the present case, the evidence established that Sgt. Pearson's alleged initial seizure of Defendant was justified by a reasonable articulable suspicion. Sgt. Pearson had been informed by the known complainant that Defendant had a short barrel shotgun which he loaded and waived around in the complainant's presence. The complainant informed Sgt. Pearson what she observed within minutes of observing it, and Sgt. Pearson was speaking with Defendant within minutes of that report, lending to the reliability of the information provided by the complainant. See,

Navarette v. California, 134 S. Ct. 1683, 1689 (2014) (providing that statements made soon after perceiving the event have "long been treated as especially reliable"); Illinois v. Gates, 462 U.S. 213, 234 (1983) ("[An informant's] explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles his tip to greater weight than might otherwise be the case."). The complainant also allowed Sgt. Pearson to record her statement, and she provided Sgt. Pearson with her identifying information which lends further credibility to the information she provided. See, United States v. Kent, 531 F.3d 642, 648–49 (8th Cir. 2008) (providing that a known informant is more reliable because a known information "could be held accountable by [law enforcement] for false information"). Sgt. Pearson not only possessed the complainant's name and phone number along with other identification information, he also took the complainant's record statement to preserve it. Sgt. Pearson spoke directly with the complainant, and he was able to ask her questions—such as how she knew the weapon was a shotgun—and was able to access her reliability and credibility. See, United States v. Stevens, 530 F.3d 714, 718–19 (8th Cir. 2008); United States v. Hill, No. 14-cv-276 (ADM/SER), 2015 WL 4136222, at *3 (D. Minn. July 8, 2015).

The pat down search of Defendant is also constitutionally justified because the information given to Sgt. Pearson by complainant also provided Sgt. Pearson with reason to believe that Defendant may have been armed. The complainant specifically told Sgt. Pearson that Defendant possessed a short barrel shotgun which he used when he felt threatened, and she further informed Sgt. Pearson that mere minutes before Sgt. Pearson was speaking with Defendant, the Defendant had been erratically waiving the loaded shotgun around at her in his apartment. "[A] reasonable prudent man . . . would be warranted in the belief that his safety or the of others was in danger" when Defendant exited his apartment where he had been seen only

moments before with a loaded short barrel shotgun, and he had admitted to the reporting complainant to using it when he felt threatened. See, United States v. Horton, 611 F.3d 936, 941 (8th Cir. 2010) (finding the a pat down search did not exceed the scope of a Terry stop where "officers had information from [a] cab driver that the suspect may be carrying a knife, and [the suspect] matched the physical description of the suspect"); United States v. Rose, 19 Fed. App'x 481, 482 (8th Cir. 2001); see also, United States v. Barnett, 505 F.3d 637, 640 (7th Cir. 2007) ("some crimes by their very nature are so suggestive of the presence and use of weapons that a frisk is always reasonable when officers have reasonable suspicion that an individual might be involved in such a crime") (citing Terry, 392 U.S. at 33). This reasonable suspicion was not dissipated by Sgt. Pearson having a brief conversation with Defendant leading up to the pat down search. Barnett, 505 F.3d at 640.

### 3. Removal of Shotgun Shell

Defendant next argues that Sgt. Pearson exceeded the scope of the pat down search when Sgt. Pearson pulled the shotgun shell from Defendant's pants pocket as a result of the pat down. During the pat down search Sgt. Pearson felt a hard cylindrical object in Defendant's pants pocket which Sgt. Pearson removed from Defendant's pocket due to Sgt. Pearson's concern that the hard cylindrical object may have been a weapon. Sgt. Pearson's seizure of the shotgun shell from Defendant's pocket did not exceed the allowable scope of the pat down search.

As safety is the singular justification for a pat down search for weapons, only searches "reasonably designed to discover concealed weapons" are permissible. Roggeman, 279 F.3d at 578. During the course of the pat down search Sgt. Pearson felt a hard cylindrical object which he believed could be a weapon. Accordingly, Sgt. Pearson removed the object to ensure it was not a weapon. Based on the record now before the Court, Sgt. Pearson's removal of the hard

cylindrical object was a reasonable measure to ensure officer safety and the safety of others. <u>See</u>, <u>United States v. Hanlon</u>, 401 F.3d 926, 930 (8th Cir. 2005) (finding officer conduct of removing an object from defendant's pants reasonable where the officer testified that he was concerned the small object he felt "could have been a pocketknife or some other type of weapon"); <u>see also</u>, <u>United States v. Hawkins</u>, 830 F.3d 742, 745 (8th Cir. 2016) ("A <u>Terry</u> search must be reasonable under the circumstances, officers may take any measure that are reasonably necessary to protect their personal safety and to maintain the status quo during the course of the stop. Though a pat-down is often the least intrusive way to search for a hidden firearm, concern for officer safety may justify lifting clothing or even reaching directly for a weapon in a waistband."); <u>United States v. Thomas</u>, No. 6-5012 (CRW/FJG), 2007 WL 62694, at *3 (W.D. Mo. Jan. 8, 2007) (noting that during a <u>Terry</u> stop an officer would have been reasonable in removing bullets from a defendant's pocket after first noticing a suspicious bulge in the pocket). In <u>Hawkins</u>, the Eighth Circuit Court of Appeals upheld a denial of a motion to suppress where an officer reached into a defendant's pocket after noticing a hard object from outside the defendant's left pants pocket. <u>Hawkins</u>, 830 F.3d at 744–45.[6] In <u>Hanlon</u>, the Eighth Circuit Court of Appeal upheld the lower Courts denial of a motion to suppress a vial of methamphetamine removed from a defendant's pocket during a <u>Terry</u> stop when the officer removed the object before he "concluded that weapons were not present," and the officer testified he was concerned with the "small object" being a weapon. <u>Hanlon</u>, 401 F.3d at 930. Thus, the <u>Hanlon</u> Court held that the "search 'stayed within the bounds of <u>Terry</u>,' and the seizure of the vial of methamphetamine was valid." <u>Id.</u> (citing <u>Minnesota v. Dickerson</u>, 508 U.S. 366, 373 (1993)).

---

[6] The Court ultimately held that "the officers' threat to perform a protective search, when they had reasonable suspicions that [defendant] was armed and dangerous, coupled with a reach," did not transform "the lawful <u>Terry</u> stop into a full-blown arrest." <u>Id.</u>

To the extent Defendant argues that the Terry stop was impermissibly extended when he was instructed to wait for five to ten minutes while officers secured a search warrant, the Court has already explained that it found Defendant's testimony to that effect not credible. Rather, the Court found more credible the testimony of Sgt. Pearson and Officer Warner which provides that once the Sgt. Pearson discovered the shell and said he was going to get a warrant, Defendant spontaneously stated that it would not be necessary, and he would show the officers where the shotgun was located. Moreover, even if Sgt. Pearson had first told Defendant to wait while Sgt. Pearson secured a search warrant, officers are permitted to truthfully explain to a defendant the process the officers will use in obtaining a warrant and asking them to stay while the warrant is secured. See, United States v. Muhlenbruch, 634 F.3d 987, 999 (8th Cir. 2011). Accordingly, based on the totality of the circumstances in the present case, the Court finds that the pat down search of Defendant stayed within the bounds of Terry, and the seizure of the shotgun shell was valid.

### 4. Consent to Search the Residence

After Sgt. Pearson removed the shotgun shell from Defendant's pocket, Sgt. Pearson then asked Defendant to have a seat in the patrol vehicle while he obtained a search warrant. Immediately following Sgt. Pearson's statement, Defendant spontaneously stated that getting the warrant was not necessary, that he would show the officers where the gun was located, that he had initially lied to Sgt. Pearson about having the shotgun which he used for protection, explained he took the shotgun from a gang member in California, and said that he knew he was not supposed to possess firearms.

Defendant argues that even if he uttered words appearing to constitute consent to search his apartment it was a tainted consent obtained only after he was "illegally searched and seized

and then threatened with being detained." (Def.'s Mem., [Docket No. 34], at 8). Defendant also argues that the Government has failed to show that the consent given by Defendant was valid and voluntary.

As to Defendant's argument that his giving of consent was only due to his being illegal searched and seized, the Court has already determined that the pat down search of Defendant, as well as, the removal of the shotgun shell from Defendant's pocket by Sgt. Pearson were within the bounds of a constitutional <u>Terry</u> stop. Accordingly, Defendant's argument that his consent was somehow tainted by unconstitutional police conduct is without merit.

Concerning Defendant's argument that his consent was not valid and voluntary, the Court also finds this argument unpersuasive for the reasons discussed below.

The Fourth Amendment guarantees the "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." <u>United States v. Davis</u>, 569 F.3d 813, 816 (8th Cir. 2009) (citing <u>Katz v. United States</u>, 389 U.S. 347, 357 (1967)). "Although a warrantless search presumptively violates the Fourth Amendment, voluntary consent to search is a well-recognized exception to the warrant requirement." <u>United States v. Golinveaux</u>, 611 F.3d 956, 959 (8th Cir. 2010). "An officer with consent needs neither a warrant nor probable cause to conduct a constitutional search." <u>United States v. Pennington</u>, 287 F.3d 739, 746 (8th Cir. 2002) (internal quotations omitted). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." <u>United States v. Williams</u>, 521 F.3d 902, 906 (8th Cir. 2008).

Consent can be given orally or in writing, and it is not necessary to use a written consent form or obtain written proof of consent. United States v. Siwek, 453 F.3d 1079, 1084 (8th Cir. 2006).

Importantly, consent must be voluntarily given. An inquiry into the voluntariness of consent "turns on the totality of the circumstances, which must demonstrate that the police reasonably believed the search to be consensual." United States v. Zamoran-Coronel, 231 F.3d 466, 469 (8th Cir. 2000); see, United States v. Quintero, 648 F.3d 660, 667 (8th Cir. 2011); United States v. Bradley, 234 F.3d 363, 366 (8th Cir. 2000). In determining whether consent was voluntary, the relevant question is whether the individual had "a reasonable appreciation of the nature and significance of his actions" or whether his will had been overborne and his capacity for self-determination critically impaired. United States v. Saenz, 474 F.3d 1132, 1136 (8th Cir. 2007); see, United States v. Vinton, 631 F.3d 476, 483 (8th Cir. 2011).

Relevant factors regarding the individual allegedly providing consent include:

(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] Miranda rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals.

United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010). The Court should also consider the environment in which the individual's consent was obtained including:

(1) the length of the detention; (2) whether the police used threats, physical intimidation, or punishment to extract consent; (3) whether the police made promises or misrepresentations; (4) whether the individual was in custody or under arrest when consent was given; (5) whether the consent was given in public or in a seclude location; and (6) whether the individual stood by silently or objected to the search.

Id. These "factors are valuable as a guide to analysis," however, "these factors should not be applied mechanically." United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990). Moreover, in determining whether an individual has expressed consent, "[t]he precise question is not

whether [the defendant] consented subjectively, but whether his conduct would have caused a reasonable person to believe that he consented." United States v. Jones, 254 F.3d 692, 695 (8th Cir. 2001) (citing United States v. Sanchez, 32 F.3d 1330, 1333–35 (8th Cir. 1994)).

The Government has the burden to show, by a preponderance of the evidence, that a defendant's consent was voluntary. See, United States v. Esquivias, 416 F.3d 696, 700 (8th Cir. 2005).

Based on the totality of the circumstances in the present case, the Court concludes that Defendant's consent to the search of his residence was voluntarily given.

First, regarding factors relevant to Defendant's characteristics, these factors support the Court's conclusion that Defendant's consent to the search was voluntary. Defendant is an adult above the age of majority with no indication that he has any difficulty in speaking and understanding English, nor that his intelligence rendered him in any way incapable of providing consent. The record demonstrates that Defendant was an adult of at least average intelligence given his ability to respond appropriately to Sgt. Pearson's questions, including refusing Sgt. Pearson's initial request to search Defendant's residence. Nothing in the record indicates that there were any signs that Defendant's intelligence was such that it rendered him incapable of providing consent. The record demonstrates that Defendant was able to understand and properly respond to Sgt. Pearson throughout their encounter.

Defendant was not informed of his rights pursuant to Miranda; however, it is well-established that, while relevant, that factor does not, by itself, render consent involuntary. See, e.g., United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010); United States v. Saenz, 474 F.3d 1132, 1137 (8th Cir. 2007) ("We have not required an officer to provide Miranda warnings before requesting consent to search or held that an absence of Miranda warnings would make an

19

otherwise voluntary consent involuntary."); United States v. Va Lerie, 424 F.3d 694, 710 (8th Cir. 2005) ("The Supreme 'Court has rejected in specific terms the suggestion that police officers must always inform citizens of their right to refuse when seeking permission to conduct a warrantless consent search.'") (quoting United States v. Drayton, 536 U.S. 194, 206 (2002)); United States v. Esquivias, 416 F.3d 696, 701 (8th Cir. 2005) ("While the officers did not inform [defendant] of his right to refuse consent, a defendant need not be aware, nor must an officer inform him, of his right to refuse consent for his voluntary consent to be voluntary.") (citing United States v. Becker, 333 F.3d 858, 861 (8th Cir. 2003)). Furthermore, there is evidence that, even without the warning, Defendant was aware of his constitutional rights as he refused Sgt. Pearson's initial request to search the residence and Sgt. Pearson honored that request. See, United States v. Willie, 462 F.3d 892, 897 (8th Cir. 2006) (providing that defendant's prior consent to search his pockets and his refusal to consent to the search of a lockbox combined with the officers honoring of the refusal "suggest that [defendant] understood both the consequences of granting consent and his right to refuse it").

There is nothing in the record indicating that Defendant was in any way intoxicated or under the influence of drugs. Even if Defendant had been under the influence of alcohol or drugs, which the record does not demonstrate, the mere fact that an individual was under the influence of drugs or alcohol does not mean he is unable to provide voluntary consent. Castellanos, 518 F.3d at 969; see, United States v. Willie, 462 F.3d 892, 896 (8th Cir. 2006) (holding that while defendant "may have been under the influence of methamphetamine at the time of his arrest, [ . . .] the evidence does not suggest that he was so intoxicated that he was not 'competent to understands the nature of his acts.'") (citing United States v. Rambo, 789 F.2d 1289, 1297 (8th Cir. 1986)). There is nothing in the record now before the Court to indicate in any way that

Defendant was intoxicated at all; and certainly, even if it is assumed for the sake of argument only that the Defendant may have ingested some alcohol or controlled substance before his encounter with Sgt. Pearson, there is no evidence in the present record that it rendered him unable to competently understand the nature of his actions. See, Willie, 462 F.3d at 896.

Additionally, the record establishes that Defendant has prior experience with the legal system. Defendant specifically testified that he had previous felony convictions including motor vehicle theft, attempted motor vehicle theft, being a felon in possession of a firearm, assault with a deadly weapon causing great bodily injury, and spousal battery with a deadly weapon causing great bodily injury. (November 7, 2017, Motions Hearing, Digital Recording at 11:56–11:58 a.m.). Defendant's prior criminal history and his prior interactions with law enforcement which that history entails provide the basis for a reasonable inference that Defendant had some knowledge of the protections that the legal system provides for suspected criminals and was aware of his rights. See, United States v. Capps, 716 F.3d 494, 497 (8th Cir. 2013) ("[Defendant] had prior interactions with law enforcement and was therefore more likely to be aware of his rights."); United States v. Buenrostro, 454 Fed. App'x 523, 526 (8th Cir. 2011); United States v. Conrad, No. 13-cr-2039, 2014 WL 712963, at *6 (N.D. Iowa Feb. 24, 2014) (quoting United States v. Golinveaux, 611 F.3d 956, 959 (8th Cir. 2010)) report and recommendation adopted, 2014 WL 1165860 (N.D. Iowa Mar. 21, 2014).

In summation, an evaluation of Defendant's personal characteristics relative to the factors enumerated by the Eighth Circuit Court of Appeals supports the conclusion that Defendant's consent to the search of his apartment at issue was voluntary.

Regarding the environmental factors relevant to Defendant's consent, these factors also support the Court's conclusion that Defendant's consent to search was voluntary. First, the

record is devoid of any indication that Sgt. Pearson, or anyone else, used any threats, physical intimidation, or punishment to extract a consent from Defendant. Additionally, there is also no indication in the record that Sgt. Pearson, or anyone else, made any promises or misrepresentations to Defendant in order to obtain Defendant's consent to the search.

Regarding the environmental factor related to the length of the detention, the record suggests that the length of time between Sgt. Pearson's initial encounter with Defendant and his consent to search was neither lengthy nor drawn out. To the extent Defendant's movement was controlled, if at all, it was for no longer than was necessary to conduct the initial Terry stop and subsequent consent search of Defendant's residence. It appears, therefore, and Defendant does not dispute, that the entire encounter was relatively short lived, and that any detention occurring after the discovery of the shotgun shell was relatively short as all parties agree that the search of the apartment was conducted directly after the discovery of the shotgun shell in Defendant's pocket.

Regarding the environmental factor asking whether Defendant was in custody or under arrest when consent was given, Officer Warner testified that Defendant was not free to leave once Sgt. Pearson found the shotgun shell in Defendant's pocket. It would have been reasonable for Defendant to believe he was not free to leave once Sgt. Pearson found the shotgun shell in his pocket, and Sgt. Pearson asked Defendant to have a seat and wait in the back of Officer Warner's patrol vehicle while he sought a warrant to search Defendant's residence. Defendant was in custody for a brief, momentary period of time before he spontaneously stated that a warrant was not necessary, and he would show the officers were the shotgun was located. The fact that Defendant was arguably in custody at the time he provided consent does not render that consent involuntary especially where the time was brief and the consent occurred in a public place. See,

United States v. Watson, 423 U.S. 411, 424 (1976) (noting that "the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search" and finding valid consent despite a defendant's arrest when the consent was given in a public setting and there was no evidence of coercive police tactics); United States v. Willie, 462 F.3d 892, 897 (8th Cir. 2006) (finding valid consent where defendant "was under arrest and handcuffed at the time he gave his consent, but he had not been subjected to extended questioning and had only been under arrest for, at most, the time that it took officers to meet briefly with the fellow occupants of room 124 and complete an inventory search of his vehicle"). The present record makes clear that consent to search the Defendant's residence was given in public, next to Officer Warner's patrol vehicle, and which was parked on a public road outside Defendant's residence. Moreover, Defendant was not restrained in handcuffs at any time prior to consenting to a search of his apartment.

The environmental factor asking whether the Defendant stood by silently or objected to the search likewise supports this Court's conclusion that Defendant's consent to the search of his residence was voluntary. There is nothing in the record indicating that Defendant did anything other than stand by silently while the search of his apartment was actually performed. In fact, Defendant assisted with the search to the extent that he exercised control over his dog and informed Sgt. Pearson that the short barreled shotgun could be found under the linens on the bed, and when he was asked about the presence of any other ammunition, Defendant without comment gave Sgt. Pearson a black bag of shotgun shells. This supports the Court's conclusion that Defendant's consent was voluntary. See, United States v. Chaidez, 906 F.2d 377, 382 (8th Cir. 1990) (finding that opening up the trunk for law enforcement supported the conclusion that the defendant voluntarily consented to the search reasoning that "[t]his type of cooperation

evinces voluntariness"); United States v. Smith, 260 F.3d 922, 925 (8th Cir. 2001) (finding that, even if defendant had not verbally consented, he had "at the very least . . .indicated his consent to the search by raising his hands").

Finally, Defendant also argues that his consent should be found involuntary because "the officer did not have [Defendant] sign a consent form or otherwise get any acknowledgment from him of his rights, even after he had already previously unquestionably asserted his right not to have his apartment searched without a warrant." (Def. Mem., [Docket No. 34], at 9–10). However, the Eighth Circuit Court of Appeal has time and again found verbal consent to be voluntary where no consent form was signed and not written acknowledgment of rights was obtained. See, e.g., United States v. Capps, 716 F.3d 494, 497 (8th Cir. 2013) (finding no err in district court's conclusion that Defendant voluntarily consented to the search of his vehicle even after defendant had twice denied the officer's request to search the interior of the vehicle); United States v. Saenz, 474 F.3d 1132, 1136–37 (8th Cir. 2007) (providing that "[c]onsent can be given orally or in writing, and it is not necessary to use a written consent form," and finding no clear err in lower court's finding that defendant voluntarily consented to the search of the truck even where defendant complaint to the lower court that he was not given a written consent form") (quoting United States v. Siwek, 453 F.3d 1079, 1084 (8th Cir. 2006)). And, on the basis of the record now before the Court, even though Defendant declined Sgt. Pearson's initial request for consent to search his apartment, the consent by Defendant now under consideration was spontaneously given by Defendant when he learned the Officers were going to seek a search warrant.

In summation, the totality of the circumstance in the present case indicates that Defendant's consent to the search of his apartment was voluntarily given, and as a result, all

evidence obtained as a result thereof was lawfully seized without any violation of Defendant's Fourth Amendment rights. Therefore, the Court recommends **DENYING** Defendants Motion to Suppress Evidence Obtained as a Result of Search and Seizure. [Docket No. 23].

## III. DEFENDANT'S MOTION TO SUPPRESS STATEMENTS, ADMISSIONS, AND ANSWERS. [DOCKET NO. 24].

Defendant next argues that "the statements [he] made following the discovery of the shotgun shells must be suppressed because his statements were not preceded by a Miranda warning and waiver of those rights." (Def. Mem., [Docket No. 34], at 10).

### A. Standard of Review

"[Miranda] prohibits the government from introducing into evidence statements made by the defendant during a custodial interrogation unless the defendant has been previously advised of his [F]ifth [A]mendment privilege against self-incrimination and right to an attorney." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005) (citing Miranda v. Arizona, 384 U.S. 436, 444 (1966)). Accordingly, Miranda warnings are required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way[.]" Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444). "Interrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)).

**B.  Analysis**

**1.  Statements Identified by Defendant**

Defendant seeks to suppress the statements he made after Sgt. Pearson discovered the shotgun shell in Defendant's pocket and informed Defendant that law enforcement was going to seek a warrant to search Defendant's residence. (See, Def.'s Mem., [Docket No. 34], at 10). Defendant argues that although the officer claims he "made admission about having a gun in the apartment and gave consent to the search, . . . those statements must be suppressed because at the time" Defendant made those statements "he was effectively under arrest and in custody, . . . the admissions were made in response to questioning about getting a warrant, [and] the officers did not advise him of his Miranda rights before engaging him in further discussion about obtaining the warrant." (Def.'s Mem., [Docket No. 34], at 10–11).[7]

After Sgt. Pearson informed Defendant that he wanted him to wait in Officer Warner's squad car because he was going to seek a search warrant for his apartment, Defendant spontaneously said that getting a warrant was not necessary, that he would show the officers where the gun was located, that he had initially lied about not having a shotgun, said he used it for protection, explained that he took the shotgun from a gang member in California, and said that he knew he was not supposed to possess firearms. After a thorough examination of the record now before the Court, the Court concludes that Defendant's statements were wholly spontaneous, and they were not the product of any custodial interrogation.

Law enforcement officers are not required to administer Miranda warning to everyone whom they question. See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977). Rather, Miranda

---

[7] Defendant also argues that the statement should be suppressed because they "were the derivative fruits of the illegal pat down search." (Id. at 11). However, the Court has already determined that the pat down search conducted by Sgt. Pearson was constitutionally within the bounds of Terry. See, § II, supra. Accordingly, the Court need not readdress that argument here.

26

warnings are only required for official interrogations where a person has been "taken into custody or otherwise deprived of his freedom of action in any significant way," Stansbury v. California, 511 U.S. 318, 322 (1994) (quoting Miranda, 384 U.S. at 444); however "[i]nterrogation under Miranda includes not only express questioning but also its functional equivalent, such as 'any word or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." United States v. Hull, 419 F.3d 762, 767 (8th Cir. 2005) (quoting Rhode Island v. Innis, 466 U.S. 291, 300–01 (1980)). Accordingly, "Miranda has no application to statements . . . that are voluntarily offered and not a product of either express questioning or any police practice reasonably likely to evoke an incriminating response." United States v. Griffin, 922 F.2d 1343, 1357 (8th Cir. 1990) (citations omitted). "Miranda does not protect an accused from a spontaneous admission made under circumstance not induced by the investigating officers or during a conversation not initiated by the officers." United States v. Hayes, 120 F.3d 739, 744 (8th Cir. 1997) (quoting United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996), cert. denied, 520 U.S. 1179 (1997)).

In the present case, Sgt. Pearson and Officer Warner both independently and separately testified that neither of them asked Defendant any question to prompt Defendant's statements. Defendant has offered no credible testimony to contradict the officers' testimony. Despite Defendant's assertions that his statements were made in response to "questioning" and "discussion," the record before the Court demonstrates that the spontaneous statements the Defendant made after Sgt. Pearson found the shotgun shell in Defendant's pocket were not in response to any interrogation, or the functional equivalent of interrogation. Sgt. Pearson simply asked Defendant to wait in Officer Warner's vehicle while he sought a warrant for Defendant's

apartment. It was then Defendant spoke, without any specific prompting of any kind. Sgt. Pearson's merely informing Defendant that he was going to get a search warrant "was a statement of fact not a plea to the conscience, and it was not accompanied by any threats or other coercive pressures," and therefore, it was not designed to illicit any incriminating response. United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005). Accordingly, the Defendant's statements were not obtained in violation of Miranda. United States v. Turner, 157 F.3d 552, 556 (8th Cir. 1998) ("We have repeatedly held that '[a] voluntary statement made by a suspect, not in response to interrogation, in not barred . . . and is admissible with or without the giving of Miranda warnings.'") (alteration in original); see, United States v. Barnes, 195 F.3d 1027, 1029 (8th Cir. 1999) (finding a defendant's statement that the officer was incorrect spontaneous after an officer advised him he was going to be booked for possession of a firearm reasoning that it was in response to a statement of fact not the functional equivalent of interrogation).

### 2. Bag of Shells

While not specifically identified or addressed by Defendant in his written arguments, when Defendant handed Sgt. Pearson the black bag of shotgun shells after the gun was located, that was arguably a nonverbal statement made in response to Sgt. Pearson's question as to whether there was any other ammunition in the apartment. As Defendant has failed to specifically identify or address this issue, he has waived his right to do so. However, the Court will address the issue now in an abundance of caution.

After Defendant spontaneously told the officers that a search warrant for his apartment was not necessary and that he would show them the location of the shotgun, Defendant led the officers into his residence. Once in the apartment, Defendant told Sgt. Pearson that the shotgun was under the linen covers in the bedroom, and Sgt. Pearson retrieved the shotgun from that very

location. Sgt. Pearson then asked Defendant if there was any other ammunition in the apartment. Defendant remained silent, but he walked to the west side of the apartment, retrieved a black cloth bag, and handed the bag to Sgt. Pearson. The bag was filled with yellow shotgun shells. This presents the question of whether the silent handing of the black cloth bag to Sgt. Pearson constituted a response to Sgt. Pearson's question or whether it was Defendant continuing to help with a consent search in which he had already assisted law enforcement moments before by controlling his dog and specifically directing Sgt. Pearson to the location of the shotgun.

The Court, however, need not decide that precise issue as it finds that the black cloth bag of shells is admissible under the inevitable discovery doctrine.

"The inevitable-discovery doctrine posits that if the prosecution can establish by a preponderance of the evidence that the information, otherwise to be suppressed under the exclusionary rule, ultimately or inevitably would have been discovered by lawful means, then the exclusionary rule does not apply." United States v. James, 353 F.3d 606, 616–17 (8th Cir. 2003) (citing Nix v. Williams, 467 U.S. 431, 444 (1984)); see, United States v. Munoz, 590 F.3d 916, 923 (8th Cir. 2010) (citing Nix v. Williams, 467 U.S. 431, 444 & 448 (1984); United States v. Thomas, 524 F.3d 855, 858 (8th Cir. 2008); United States v. Pruneda, 518 F.3d 597, 604 (8th Cir. 2008)). To make showing of inevitable discovery, the Government must show by a preponderance of the evidence that: "(1) there was a reasonable probability that the evidence would have been discovered by lawful means in the absence of police misconduct, and (2) that the government was actively pursuing a substantial, alterative line of investigation at the time of the constitutional violation." James, 353 F.3d at 617. "In this analysis, 'it is important to focus not on what the officers actually did after . . . recovering evidence, but on what the officers were reasonably likely to have done had the . . . recovery not occurred.'" United States v.

McManaman, 673 F.3d 841, 846 (8th Cir. 2012) (quoting United States v. Villalba-Alvarado, 345 F.3d 1007, 1020 (8th Cir. 2003)).

At the time Sgt. Pearson asked Defendant if there was any other ammunition in the apartment, Sgt. Pearson had already pursuant to Defendant's consent and with his assistance conducted a consent search of the apartment to locate the shotgun. Sgt. Pearson had also discovered a shotgun shell in Defendant's pocket pursuant to a lawful Terry pat down search. As the record demonstrates, had Defendant not spontaneously provided consent to search his apartment, Sgt. Pearson had already indicated his intent to secure a search warrant for Defendant's residence. Had Defendant not voluntarily consented to the search, Sgt. Pearson would have secured the search warrant. Sgt. Pearson had been informed by a known complainant that Defendant had the short barrel shotgun and ammunition in his apartment, Sgt. Pearson had discovered a single shotgun shell in Defendant's pants pocket, and he seized the shotgun, without ammunition, from Defendant's residence pursuant to Defendant's consent and with his assistance. Based on this information, there is a reasonable probability that if Defendant had not walked over to retrieve the black bag with shotgun shells in it, Sgt. Pearson would have obtained a search warrant on the basis of all the forgoing information and the additional shotgun shells would have inevitably been seized.

As to the second prong, the record further demonstrates by a preponderance of the evidence that law enforcement was pursuing a substantial, alternative line of investigation at the time Sgt. Pearson asked Defendant if there was any additional ammunition in the apartment. The intent to secure a search warrant and Defendant's spontaneous statements satisfy this requirement. See, United States v. Pruneda, 518 F.3d 597, 604 (8th Cir. 2008) (finding that "inevitable discovery exception to the exclusionary rule validated the admission of the evidence"

30

where there was "a reasonable probability that law enforcement would have obtained a search warrant with the information collected from . . . informants, and thus the district court did not err in denying the motion to suppress"); United States v. Hammons, 152 F.3d 1025, 1030 (8th Cir. 1998) (finding that officer was pursuing a substantial, alternative line of investigation where he told defendant that he would call drug dog but had not actually yet called the drug dog because it showed he had an alternative plan, "if [defendant] did not consent, the officer was prepared to walk back to his patrol car and radio the drug-canine unit"); United States v. Lindgren, No. 8-cr-36 (JMR/RLE), 2008 WL 2704219, at *14, n.9 (D. Minn. July 3, 2008) (finding in the alternative that the marijuana would be admissible pursuant to the inevitable discovery doctrine because testimony of law enforcement officers demonstrated that they "would have sought a Search Warrant for the Defendant's residence . . . as an alternative investigatory approach, if the Defendant had refused to identify the location of the marijuana, which would have led to the ultimate discovery of the contested evidence") (citing United States v. Warford, 439 F.3d 836, 844 (8th Cir. 2006); United States v. Conner, 127 F.3d 663, 667–68 (8th Cir. 1997)). The separate consent to search and the asking of the question regarding the presence of other ammunition by Sgt. Pearson were the only things that stopped the officers in the present case from obtaining a search warrant for Defendant's residence based on reliable information they possessed even before Sgt. Pearson asked Defendant if there was any additional ammunition.

Accordingly, the Court concludes that the record now before the Court demonstrates by a preponderance of the evidence both that there is a reasonable probability that the black bag of shotgun shells would have been inevitably found even absent Sgt. Pearson asking Defendant if any other ammunition was in the apartment, and that the police had been prepared to pursue a substantial alternative line of investigation at the time.

Because the statements made by Defendant at the patrol vehicle were spontaneous and voluntary and because the police would have inevitably discovered the black bag of shotgun shells in Defendant's residence, the Court recommends **DENYING** Defendant's Motion to Suppress Statements, Admission, and Answers. [Docket No. 24].

## IV.    CONCLUSION

Based on the foregoing and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1.    Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure, [Docket No. 23], be **DENIED**; and

2.    Defendant's Motion to Suppress Statements, Admissions, and Answers, [Docket No. 24], be **DENIED**.

Dated: January 17, 2018                                          s/Leo I. Brisbois
                                                                Leo I. Brisbois
                                                                U.S. MAGISTRATE JUDGE

# N O T I C E

**Filing Objections:** This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "A party may file and serve specific written objections to a magistrate judge's proposed findings and recommendation within 14 days after being served with a copy of the recommended disposition[.]"  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2). All objections and responses must comply with the word or line limits set forth in LR 72.2(c).

**Under Advisement Date:** This Report and Recommendation will be considered under advisement 14 days from the date of its filing.  If timely objections are filed, this Report and Recommendation will be considered under advisement from the earlier of: (1) 14 days after the objections are filed; or (2) from the date a timely response is filed.